FILED

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

DEC 0 5 2018

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

In the Matter of the Seizure of )
)
*(Briefly describe the property to be seized)* )  Case No. 5:18-mj-2085-JG
**PNC Bank accounts 5384574726 and 5384574742** )
)

### APPLICATION FOR A WARRANT
### TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the ___Eastern___ District of ___North Carolina___ is subject to forfeiture to the United States of America under ___18___ U.S.C. § ___981 and 982___ *(describe the property)*:

See Attachment A

The application is based on these facts:
See attached affidavit

☐ Continued on the attached sheet.

*Robt A. Richard Jr.*
*Applicant's signature*

ROBERT A. RICHARDS JR. SPECIAL AGENT
*Printed name and title*

*Eric J. Phillip*
*Applicant's signature*

Eric J. Phillips Special Agent
*Printed name and title*

On this __5__ day of December 2018, ROBERT A RICHARDS, JR + ERIC J. PHILLIPS _____ appeared before me via reliable electronic means, ~~was~~ were placed under oath, and attested to the contents of this ~~Affidavit~~ Application.

Date: __5 Dec. 2018__

_____
*Judge's signature*

City and state: __Raleigh, NC__

JAMES E. GATES, U.S. Magistrate Judge
*Printed name and title*



**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR A SEARCH AND SEIZURE WARRANT**

STATE OF NORTH CAROLINA

COUNTY OF WAKE, to wit:

We, ERIC J. PHILLIPS and ROBERT A. RICHARDS, being first duly sworn, do hereby depose and say:

### INTRODUCTION

1. We make this affidavit in support of a seizure warrant pursuant to 18 U.S.C. §§ 981(b) and 982(b)(1), to seize for purposes of civil and/or criminal forfeiture the funds and assets described below as property representing the proceeds of, involved in, or facilitating violations of, 18 U.S.C. §§ 18 U.S.C. §§ 371 (Conspiracy), 1956(a)(1) (Laundering of Monetary Instruments), 1956(a)(2) (International Money Laundering), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), 1956(h) (money laundering conspiracy), and offenses against a foreign nation involving the bribery of a public official:

a. The balance of funds in account number 237011763905, (hereinafter "BOA 3905") in the name of Leonid I. Teyf at Bank of America in an amount not to exceed $14,676,108, the proceeds of LEONID I. TEYF's specified

unlawful activities that have been deposited into the account;

b. The balance of funds in account number 237025336014, (hereinafter "BOA 6014") in the name of Tatyana A. Teyf at Bank of America in an amount not to exceed $17,924,907, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

c. The balance of funds in account number 237026903844, (hereinafter "BOA 3844") in the name of Tatyana Teyf Revocable Trust, Tatyana A. Teyf, and Leonid I. Teyf at Bank of America in an amount not to exceed $2,777,022, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

d. The balance of funds in account number 237027279409, (hereinafter "BOA 9409") in the name of Leonid Teyf Revocable Trust, Leonid I. Teyf, and Tatyana A. Teyf at Bank of America in an amount not to exceed $4,036,952, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

e. The balance of funds in account number 237005851991, (hereinafter "BOA 1991") in the name of Leonid I. Teyf at Bank of America in an amount not to exceed $14,939,556, the proceeds of LEONID I. TEYF's specified

unlawful activities that have been deposited into the account;

f. The balance of funds in account number 237034389748, (hereinafter "BOA 9748") in the name of Tatyana Teyf at Bank of America in an amount not to exceed $9,000,000, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

g. The balance of funds in account number 237018033285, (hereinafter "BOA 3285") in the name of Leonid I. Teyf and Tatyana A. Teyf at Bank of America in an amount not to exceed $5,962,121, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

h. The balance of funds in account number 696801736, (hereinafter "BOA 1736") in the name of New Market Way, LLC, Leonid I. Teyf and Tatyana A. Teyf at Bank of America in an amount not to exceed $1,300,000, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

i. The balance of funds in account numbers 291016081314, (hereinafter "BOA 1314") , (hereinafter "BOA 1292") and 291015873691, (hereinafter "BOA 3691") in the names of CTK Transportation, Inc., Leonid I. Teyf and Alexey Timofeev at Bank of America in an amount not to exceed

$30,000, $56,000, and $60,000, respectively, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the CTK Transportation, Inc. accounts.

j. The balance of funds in account number , 291022321563, (hereinafter "BOA 1563") in the names of CTK Transportation, Inc., Alexey Timofeev, and Tatyana A. Teyf at Bank of America in an amount not to exceed $40,000, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

k. The balance of funds in account number 291024427892, (hereinafter "BOA 7892") in the name of Alexey Timofeev and Olesya Timofeeva at Bank of America in an amount not to exceed $25,000, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account.

l. The balance of funds in account number 237012294884, (hereinafter "BOA 4884") in the name of Alexey Timofeev and Olesya Timofeeva at Bank of America in an amount not to exceed $267,500, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

m. The balance of funds in account number 868433951, (hereinafter "FCB 3951") in the name of Tatyana Teyf at First Citizens Bank in an amount not to exceed $2,450,000, the

proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

n. The balance of funds in account number 878320918, (hereinafter "FCB 0918") in the name of Tatyana Teyf at First Citizens Bank in an amount not to exceed $2,400,000, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

o. The balance of funds in account number 5401101502, (hereinafter BB&T 1502") in the names of Leonid I. Teyf and Grigory L. Teyf at BB&T in an amount not to exceed $5,035,000, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

p. The balance of funds in account number 868433812, (hereinafter "FCB 3812") in the names of Leonid I. Teyf and Grigory L. Teyf at First Citizens Bank in an amount not to exceed $5,035,007, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

q. The balance of funds in account number 878320897, (hereinafter "FCB 0897") in the names of Leonid I. Teyf and Grigory L. Teyf at First Citizens Bank in an amount not to exceed $5,000,000, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

r. The balance of funds in account number 5208134304, (hereinafter "BB&T 4304") in the name of Lank Ventures, LLC at BB&T in an amount not to exceed $1,000,000, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

s. The balance of funds in account number 5384574726, (hereinafter "PNC 4726") in the names of Leonid I. Teyf and Grigory L. Teyf at PNC Bank in an amount not to exceed $5,035,000, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

t. The balance of funds in account number 5384574742, (hereinafter "PNC 4742") in the names of Leonid I. Teyf and Grigory L. Teyf at PNC Bank in an amount not to exceed $5,035,000, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

u. TEYF's black 2014 Mercedes Benz S550V, with VIN # WDDUG8CB9EA008419, purchased on or about October 25, 2013, with funds traceable to the criminal proceeds of TEYF's unlawful specified activity.

v. T. Teyf's black 2014 Mercedes Benz S550, with VIN #WDDUG8CB9EA009828, purchased on or about February 3, 2014,

with funds traceable to the criminal proceeds of TEYF's unlawful specified activity.

    w. T. Teyf's white, four door, 2018 Mercedes Benz S560, with VIN # WDDUG8DB8JA368001, purchased on or about June 4, 2018, with funds traceable to the criminal proceeds of TEYF's unlawful specified activity.

    x. TEYF's black, 2018 Mercedes Benz S63 AMG 4MA, with VIN # WDDUG8JB0JA394158, purchased on or about February 27, 2018, with funds traceable to the criminal proceeds of TEYF's unlawful specified activity.

### NATURE OF INVESTIGATION

2.    The United States is investigating LEONID I. TEYF, TATYANA A. TEYF, ALEXEY TIMOFEEV, JOHN P. COTTER and others for violations of 18 U.S.C. §§ 371 (Conspiracy), 1956(a)(1) (Laundering of Monetary Instruments), 1956(a)(2) (International Money Laundering), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), 1956(h) (Money Laundering Conspiracy), 26 U.S.C. §§ 7201 (Attempt to evade or defeat tax), 7203 (Willful failure to file return, supply information, or pay tax, 7206(1) (Fraud and false statements), and offenses against a foreign nation involving the bribery of a public official.

3.    These violations arise from TEYF's transfer of



criminally derived proceeds of specified unlawful activity into the United States and use of financial institutions within the United States to conceal or disguise the source, ownership, and control of said criminal proceeds, and from the spending of such proceeds.

## BACKGROUND OF INDIVIDUALS, ENTITIES, AND ACCOUNTS

### Individuals

4.     According to Form I-134, Affidavit of Support filed with the Department of Homeland Security, U.S. Citizenship and Immigration Services, in the name of TEYF and appearing to have been signed by TEYF and dated on or about December 28, 2010:

a.     LEONID ISAAKOVICH TEYF ("TEYF") was born in Beryozki, Gomelskiy Raion, Belarus on or about September 16, 1961.

b.     TEYF has been in the United States since approximately December 20, 2010 and was previously a resident of Russia.

c.     TEYF had been the President of Delta Plus, LLC, since May 2010 and previously served as President of FG Delta Plus from April 2005 to May 2010.

5.     According to Form I-140, Immigrant Worker Petition, filed with the Department of Homeland Security, U.S. Citizenship and Immigration Services, dated November 3, 2010, and signed by John P. Cotter on behalf of Delta Plus, LLC, TEYF graduated from

Moscow Cooperative Institute of Centrosouz with a degree in Trade and Economics in 1982 and from the North-Western Academy of Public Administration in St. Petersburg, Russia with a degree in Law in 1998.

6. John P. Cotter ("Cotter"), a citizen of the United States, was born on or about January 1, 1968. In 2010 Cotter, as shareholder of Delta Plus, LLC, the United States based subsidiary of FG Delta Plus, sponsored TEYF to receive a United States Visa.

7. Lisa Cotter ("L. Cotter") is the spouse of Cotter.

8. Tatyana Anatolyevna Teyf (a/k/a Tatiana "T. Teyf"), TEYF's spouse, is a citizen of Russia and currently a resident legal alien of the United States. T. Teyf was born on or about July 28, 1977 in Russia.

9. According to Form I-539, Application to Extend/Change Nonimmigrant Status, in the name of Olesya Timofeeva, dated March 10, 2015:

   a. Alexey Timofeev ("Timofeev") is a citizen of the Russian Federation, born on or about December 9, 1980;

   b. Timofeev has been in the United States since approximately October 28, 2014.

   c. Olesya Timofeeva ("Timofeeva"), Timofeev's spouse, is a Russian citizen, born on or about April 14, 1977.

   d. Timofeeva has been in the United States since approximately October 28, 2014, pursuant to a B-2 Visa.



According to Timofeev, Timofeeva has had a personal relationship with T. Teyf for over twenty (20) years; and T. Teyf sponsored Timofeeva's B-2 Visa application.

Entities

10. Fishing Group (FG) Delta Plus is a multinational company headquartered in Volodarskiy, Russia, and was organized on or about April 8, 2002. FG Delta Plus reportedly has over fifteen hundred (1,500) employees, eighty (80) fishing vessels, and annual revenue in excess of $14 Million (USD) and is one of the largest fisheries and fish processing plants in the Volga region of Russia.

11. Delta Plus, LLC, is a Limited Liability Company organized in the State of North Carolina for the primary purpose of operating an urgent care clinic; and is an 80% owned subsidiary of FG Delta Plus. According to the Operating Agreement, Cotter and L. Cotter are each 10% owners of Delta Plus, LLC. In addition to being partial owners of Delta Plus, LLC, Cotter serves as Operations Manager and L. Cotter has served as Office Manager of Delta Plus, LLC.

12. Voentorg is a Russian corporation that provided contract services to the Russian military during the period of TEYF's specified unlawful activity. Between 2010 and 2012, exact dates unknown, TEYF served as the Deputy Director of Voentorg. As such, TEYF arranged for subcontractors in Russia to fill the various goods and services required of Voentorg' s contract with the

Russian Ministry of Defense.

13. CTK Transportation Incorporated ("CTK Transportation, Inc.") was incorporated in the State of Illinois, on or about December 27, 2012. According to corporate registration documents, Timofeev is the registered agent, TEYF is the President, and Cotter is the Secretary of CTK Transportation, Inc. CTK Transportation, Inc. is believed to be used by TEYF to launder money here in the United States.

14. Carolina Transport Group, Inc. ("Carolina Transport") was incorporated in the State of Illinois, on or about August 25, 2014. According to corporate registration documents, Manuel Vasilyev is the registered agent, T. Teyf is the President, Alex Sviridov is the Secretary, and Timofeev is the Director of Carolina Transport, which is believed to be used by TEYF here in the United States to launder criminal proceeds of specified unlawful activity.

15. Lank Ventures, LLC was incorporated in the State of North Carolina, on or about May 26, 2017. According to the Articles of Incorporation, Nikita Zhitov, TEYF, and Alexei Polyakov are listed as the Members/Organizers of Lank Ventures, LLC. The principal office is listed as 2810-2A Yonkers Road, Raleigh, North Carolina 27604. Lank Ventures, LLC is believed to be used by TEYF to launder money here in the United States, by purchasing multiple properties in North Carolina.

16. Burgow Overseas Ltd. is a company registered in Tortola, British Virgin Island, on or about November 9, 2007. According to the corporate registration, KPM Invest, Ltd. was the sole director and Alemi Holdings, Ltd. was the sole shareholder, both of Limassol, Cyprus. The beneficial owner of the company was listed as Volodymyr Kit of Gusyatin, Ukraine. Burgow Overseas Ltd. is believed to be a shell company used by TEYF to conceal the transfer of money from Russia to the United States.

17. A.S. Fairtime Limited is a company registered in Tortola, British Virgin Island, on or about December 6, 2010. According to the corporate registration, KPM Invest, Ltd. was the sole director and Alemi Holdings, Ltd. was the sole shareholder, both of Limassol, Cyprus. The beneficial owner of the company was listed as Michail Akatov of Saint Petersburg, Russia. A.S. Fairtime Limited is believed to be a shell company used by TEYF to conceal the transfer of money from Russia to the United States.

18. Bektop A.B. Ltd is a company registered in Tortola, British Virgin Island, on or about June 2, 2011. According to the corporate registration, KPM Invest, Ltd. was the sole director and Alemi Holdings, Ltd. was the sole shareholder, both of Limassol, Cyprus. The beneficial owner of the company was listed as Aleksandr Byzov of Saint Petersburg, Russia. The company was dissolved on September 14, 2016. Bektop A.B. Ltd. is believed to be a shell company used by TEYF to conceal the transfer of money from Russia

to the United States.

19. Golston Holdings, Ltd is a company registered in Tortola, British Virgin Island, on or about January 3, 2012. According to the corporate registration, KPM Invest, Ltd. was the sole director and Alemi Holdings, Ltd. was the sole shareholder, both of Limassol, Cyprus. The beneficial owner of the company was listed as Mikhaylov Evgeny of Saint Petersburg, Russia. Golston Holdings, Ltd. is believed to be a shell company used by TEYF to conceal the transfer of money from Russia to the United States.

20. Mulligan Overseas Ltd. is a company registered in Tortola, British Virgin Island, on or about February 22, 2011. According to the corporate registration, KPM Invest, Ltd. was the sole director and Alemi Holdings, Ltd. was the sole shareholder, both of Limassol, Cyprus. The beneficial owner of the company was listed as Viktor Kudrjavtsev of Tallin, Estonia. Mulligan Overseas Ltd. is believed to be a shell company used by TEYF to conceal the transfer of money from Russia to the United States.

21. Nearstar BB Limited is a company registered in Tortola, British Virgin Island, on or about December 3, 2010. According to the corporate registration, KPM Invest, Ltd. was the sole director and Alemi Holdings, Ltd. was the sole shareholder, both of Limassol, Cyprus. The beneficial owner of the company was listed as Aleksandr Alekseev of Saint Petersburg, Russia. Nearstar BB Limited is believed to be a shell company used by TEYF to conceal

the transfer of money from Russia to the United States.

22. Verison Trading LTD is a company registered in Tortola, British Virgin Island, on or about October 20, 2010. According to the corporate registration, KPM Invest, Ltd. was the sole director and Alemi Holdings, Ltd. was the sole shareholder, both of Limassol, Cyprus. The beneficial owner of the company was listed as Valentina Osokina of Saint Petersburg, Russia. Verison Trading Ltd. is believed to be a shell company used by TEYF to conceal the transfer of money from Russia to the United States.

23. Greatewood Universal Corp is a company registered in Tortola, British Virgin Island, on or about September 20, 2005. According to the corporate registration, Dmitry Kalmykov of Moscow, Russia was the sole director, shareholder, and beneficial owner of the company. Greatewood Universal Corp. is believed to be a shell company used by TEYF to conceal the transfer of money from Russia to the United States.

24. Foxcorp Limited is a company registered in Tortola, British Virgin Island, on or about September 26, 2008. According to the corporate registration, Alexander Yakovlev of the Russian Federation was the sole shareholder and beneficial owner of the company. There is no known director for the company. Foxcorp Limited is believed to be a shell company used by TEYF to conceal the transfer of money from Russia to the United States.

25. Morital Holdings Limited is a company registered in

Tortola, British Virgin Island, on or about July 28, 2011. According to the corporate registration, Cenono Management Limited of Limassol, Cyprus was listed as the sole director and shareholder, and Dmitry Kalmykov of Moscow, Russia was listed as beneficial owner of the company. Morital Holdings Limited is believed to be a shell company used by TEYF to conceal the transfer of money from Russia to the United States.

26. Alung Enterprises Limited is a company registered in the Republic of the Marshall Islands on or about November 30, 2010. The company was "annulled" on or about January 14, 2015, and so no longer exists. Alung Enterprises Limited is believed to be a shell company used by TEYF to conceal the transfer of money from Russia to the United States.

27. Eponlo Investments Ltd. is a British Virgin Island Business Company formed in the British Virgin Islands on or about November 21, 2011 and the registered agent was Icaza, Gonzalez-Ruiz & Aleman (BVI) Trust Limited. According to the registration documents, the director of the company was KPM Invest Ltd., of Christodoulou Chadgipavlou 205, Louloupis Court, 2nd Floor, 3036 Limassol, Cyprus and the shareholder of the company was Alemi Holdings, Ltd. with the same reported address. Also according to the original registration, Stepanov Genadiy of St. Petersburg, Russia was the beneficial owner of the company. Eponlo Investments Ltd. is believed to be a shell company used by TEYF to conceal the

transfer of money from Russia to the United States.

28. Preble Group Ltd. is a company registered in Tortola, British Virgin Island, on or about January 3, 2012. Stepanov Genadiy of St. Petersburg, Russia is also the known beneficial owner of Preble Group LTD. Preble Group, Ltd. is believed to be a shell company used by TEYF to conceal the transfer of money from Russia to the United States.

29. Prana Investments Management, Inc. is a company formed in Panama on or about September 10, 2006 and the registered agent was Mossack Fonseca & Co. According to the registration documents, the subscribers of the company are Enders, Inc. and Rockall, Inc. Also according to the original registration, the President was Inessa Kirsanova, the Treasurer was Roman Perepela, and the Secretary was Denis Bannikonv. Prana Investments Management, Inc. is believed to be a shell company used by TEYF to conceal the transfer of money from Russia to the United States.

30. Oktava Business Team Corp. is a company formed in Panama on or about January 5, 2005 and the registered agent was Mossack Fonseca & Co. According to the registration documents, the subscribers of the company were Dulcan, Inc. and Winsley, Inc. Also according to the original registration, the President was Inessa Kirsanova, the Treasurer was Roman Perepela, and the Secretary was Denis Bannikonv. Oktava Business Team Corp. is believed to be a shell company used by TEYF to conceal the transfer

of money from Russia to the United States.

Financial Accounts

**Summary**

31.  Since at least December 2010, TEYF, T. Teyf, Cotter, L. Cotter, Timofeev, Timofeeva, and others have opened at least seventy (70) financial accounts using over five (5) domestic financial institutions, in the names of themselves and businesses under their control. TEYF and others have received at least 294 wires for an approximate total of $39,500,000 into four (4) accounts, BOA 3905, BOA 6014, BOA 3844, BOA 9409, held in TEYF's name and the names of co-conspirators at Bank of America, N.A. The source of 293 of the wires for approximately $39,415,000 was foreign corporations and bank accounts in countries commonly known to be used for money laundering.

32.  TEYF and others transferred the criminally derived proceeds of specified unlawful activity from BOA 3905, BOA 6014, BOA 3844, and BOA 9409 to several other accounts under the control of TEYF and others including BOA 1991, BOA 9748, BOA 3285, BOA 1736, BOA 1314, BOA 4884, FCB 3951, BBT 1502, FCB 3812, FCB 0897, and PNC 4726. From the aforementioned accounts, the criminal proceeds of TEYF's specified unlawful activities were further transferred into additional financial accounts and used to make purchases in support of the lifestyles of TEYF, T. Teyf Cotter, Timofeev, A. Timofeeva and others, including the purchase of luxury

automobiles and real property. More specifically, TEYF, T. Teyf, and others made the following expenditures:

a.    On or about October 25, 2013, TEYF purchased a black 2014 Mercedes Benz S550V, with VIN # WDDUG8CB9EA008419, from Mercedes Benz of Cary (a Leith Automotive Group Dealer), 2400 Autopark Boulevard, Cary, North Carolina. The purchase price of the 2014 Mercedes S550V was $114,364.25. On or about October 25, 2013, TEYF purchased an official check using funds from BOA 6014 in the amount of $112,364.25. Also on or about October 25, 2013, a debit in the amount of $2,000.00 was made from BOA 3285 payable to "Leith Inc."

b.    On or about February 3, 2014, T. Teyf purchased a black 2014 Mercedes Benz S550, with VIN # #WDDUG8CB9EA009828, from Leith Mercedes Benz (a Leith Automotive Group Dealer), 5607 Capital Boulevard, Raleigh, NC 27616 North Carolina. The purchase price of the 2014 Mercedes S550 was $116,106.95. On or about February 3, 2014, T. Teyf purchased an official check using funds from BOA 6014 in the amount of $114,106.95. Also on or about February 3, 2014, a debit in the amount of $2,000.00 was made from BOA 3285 payable to "Leith Inc."

c.    On or about June 4, 2018, T. Teyf purchased a white, four door, 2018 Mercedes Benz S560, with VIN # WDDUG8DB8JA368001, from Leith Mercedes Benz (a Leith Automotive Group Dealer), 5607 Capital Blvd, Raleigh, NC

27616. The purchase price of the white 2018 Mercedes S560 was approximately $120,000. On or about June 4, 2018, an official check was obtained from Bank of America from funds withdrawn from BOA 6014. This official check was in the amount of $118,000.00.

d.    On or about February 27, 2018, TEYF purchased a black, 2018 Mercedes Benz S63 AMG 4MA, with VIN # WDDUG8JB0JA394158, from Leith Mercedes Benz (a Leith Automotive Group Dealer), 5607 Capital Blvd, Raleigh, NC 27616. The purchase price of the black 2018 Mercedes S63 AMG 4MA was approximately $163,000. On or about February 27, 2018, official check number 490826 was made payable to Leith, Inc. and obtained from PNC Bank, N.A. from funds withdrawn from PNC 4726. This official check was in the amount of $163,000.

## Accounts

33.    On or about June 3, 2011, Cotter was removed as owner and authorized signer from checking account BOA 3905 at Bank of America, N.A. As of that date the only remaining individual with signature authority over BOA 3905 was TEYF. On or about February 13, 2017 three beneficiaries of the account were added to the account as, payable upon death ("POD"). The monthly statement dated January 5, 2011, was addressed to Cotter and TEYF at 1526 Town Home Drive, Raleigh, North Carolina 27502. The monthly statement

dated January 5, 2018, was addressed to TEYF at 510 Glenwood Avenue, Apartment 503, Raleigh, North Carolina 27603.

34. On or about September 18, 2012, TEYF opened demand deposit account BOA 9409, (a/k/a LT Revocable Trust) at Bank of America, N.A. TEYF and T. Teyf were listed as sole individual owners and were the only authorized signers on the account. The monthly statement dated October 29, 2012, was addressed to LT Revocable Trust, TEYF, and T. Teyf at 235 Franconia Way, Apex, North Carolina 27502. The monthly statement dated January 29, 2018, was addressed to LT Revocable Trust, TEYF, and T. Teyf at 510 Glenwood Avenue, Apartment 503, Raleigh, North Carolina 27603.

35. On or about September 18, 2012, T. Teyf opened demand deposit account BOA 3844, (a/k/a TT Revocable Trust) at Bank of America, N.A. TEYF and T. Teyf were listed as sole individual owners and were the only authorized signers on the account. The monthly statement dated September 13, 2012, was addressed to TT Revocable Trust and T. Teyf at 235 Franconia Way, Apex, North Carolina 27502. The monthly statement dated January 16, 2018, was addressed to TT Revocable Trust, T. Teyf, and TEYF at 510 Glenwood Avenue, Apartment 503, Raleigh, North Carolina 27603.

36. On or about February 11, 2015, T. Teyf added three beneficiaries, as POD, to BOA 6014 at Bank of America, N.A. As of that date, T. Teyf was the only known owner and authorized signer on the account. The monthly statement dated May 7, 2012 for the

account, was addressed to T. Teyf at 235 Franconia Way, Apex, North Carolina 27502. The monthly statement dated January 5, 2018 for the account, was addressed to T. Teyf at 6510 New Market Way, Raleigh, North Carolina 27615.

37. On or about June 23, 2015, Teyf was removed as owner and authorized signer from demand deposit account BOA 3285. As of that date the only remaining individual with signature authority over BOA 3285 was T. TEYF. The monthly statement dated January 24, 2011 for the account, was addressed to T. Teyf and TEYF at 235 Franconia Way, Apex, North Carolina 27502. The monthly statement dated January 24, 2018 for the account, was addressed to T. Teyf at 6510 New Market Way, Raleigh, North Carolina 27615.

38. On or about June 23, 2015, T. Teyf was removed as owner and authorized signer from savings account BOA 1991. As of that date the only remaining individual with signature authority over BOA 1991 was TEYF. The monthly statement dated June 28, 2011 for the account, was addressed to TEYF and T. Teyf at 235 Franconia Way, Apex, North Carolina 27502. The monthly statement dated January 29, 2018 for the account, was addressed to TEYF at 510 Glenwood Avenue, Apartment 503, Raleigh, North Carolina 27603.

39. On or about November 20, 2015, Cotter and L. Cotter signed a business signature card for demand deposit account BOA 2231, a/k/a Delta Plus, LLC, at Bank of America, N.A. Cotter and L. Cotter were listed as Members of the LLC and the only authorized

signers on the account. Between January 1, 2011 and December 31, 2017, Bank of America, N.A. issued monthly statements to Delta Plus, LLC at 1526 Town Home Drive, Apex, North Carolina 27502.

40.   On or about June 22, 2016, T. Teyf opened demand savings account BOA 9748 at Bank of America, N.A. T. Teyf was listed as sole owner and was the only authorized signer on the account. Three (3) beneficiaries were included on the account as POD. Between July 14, 2016 and January 16, 2018, Bank of America, N.A. issued monthly statements to T. Teyf and beneficiaries at 6510 New Market Way, Raleigh, NC 27615.

41.   On or about September 7, 2012, T. Teyf opened demand deposit account BOA 1736 at Bank of America, N.A. L. TEYF and T. Teyf were listed as owner and authorized signers on the account. Between November 1, 2012 and June 1, 2017, Bank of America, N.A. issued monthly statements to New Market Way, LLC at 6510 New Market Way, Raleigh, NC 27615.

42.   On or about November 28, 2014, Timofeeva and Timofeev opened demand deposit account BOA 4884 at Bank of America, N.A. Timofeev and Timofeeva were listed as owners and authorized signers on the account. Between November 3, 2014 and January 25, 2018, Bank of America, N.A. issued monthly statements to Timofeeva and Timofeev at 7623 Sussex Creek Drive, Apartment 210, Darien, IL 60561.

43. On or about September 30, 2017, Timofeev and Timofeeva opened demand deposit account BOA 7892 at Bank of America, N.A. Timofeev and Timofeeva were listed as owners and authorized signers on the account. Between October 2, 2017 and January 26, 2018, Bank of America, N.A. issued monthly statements to Timofeeva and Timofeev at 7623 Sussex Creek Drive, Apartment 210, Darien, IL 60561.

44. On or about February 12, 2018, TEYF opened demand deposit account FCB 3812 at First Citizens Bank. TEYF and Grigory L. Teyf were listed as the owners and authorized signers on the account. Between March 9, 2018 and September 11, 2018, First Citizens Bank issued monthly statements to TEYF and Grigory L. Teyf at 510 Glenwood Ave, Apartment 503, Raleigh, North Carolina 27603.

45. On or about February 12, 2018, TEYF opened demand deposit account FCB 0897 at First Citizens Bank. TEYF and Grigory L. Teyf were listed as the owners and authorized signers on the account. Between March 9, 2018 and September 11, 2018, First Citizens Bank issued monthly statements to TEYF and Grigory L. Teyf at 510 Glenwood Ave, Apartment 503, Raleigh, North Carolina 27603.

46. On or about March 20, 2018, T. Teyf opened demand deposit account FCB 3951 at First Citizens Bank. T. Teyf was listed as the sole owner and authorized signer on the account. Between March 20, 2018 and September 11, 2018, First Citizens Bank issued monthly

statements to T. Teyf at 6510 New Market Way, Raleigh, North Carolina 27615.

47. On or about March 20, 2018, T. Teyf opened demand deposit account FCB 0918 at First Citizens Bank. T. Teyf was listed as the sole owner and authorized signer on the account. Between March 20, 2018 and September 11, 2018, First Citizens Bank issued monthly statements to T. Teyf at 6510 New Market Way, Raleigh, North Carolina 27615.

48. Beginning on or about February 26, 2013 through August 25, 2017, at least eleven (11) bank accounts at two (2) financial institutions in the United States were opened in the name of CTK Transportation, Inc. The common authorized signers among the accounts have been TEYF and Timofeev, with T. Teyf, Cotter, and others authorized on some of the accounts in the name of CTK Transportation, Inc. The following accounts were opened at Bank of America, N.A. in the name of CTK Transportation, Inc.:

    a.    BOA 1563 was opened on or about August 30, 2016 with authorized signers listed as Timofeev and T. Teyf;

    b.    BOA 1314 was opened on or about March 25, 2016 with authorized signers listed as L. TEYF and Timofeev;

    c.    BOA 1292 was opened on or about March 25, 2016 with authorized signers listed as L. TEYF and Timofeev; and

    d.    BOA 3691 was opened on or about March 25, 2016 with authorized signers listed as L. TEYF and Timofeev.

49. Additional accounts have been opened in the names of TEYF, T. Teyf, Cotter, Timofeev, Timofeeva, and others at PNC, N.A., including PNC 4726, PNC 4742, BB&T, including Accounts BB&T 4304 and BB&T 1502, and others at Wells Fargo and JP Morgan Chase.

## AFFIANT BACKGROUND

50. I, Eric J. Phillips, am a Special Agent of the Internal Revenue Service Criminal Investigation Division ("IRS"). As such, I am a federal law enforcement officer within the meaning of Rule 41 of the Federal Rules of Criminal Procedure, and I am authorized to apply for and serve search and seizure warrants and make arrests. I have been employed as an IRS Special Agent since January of 2010.

a. As an IRS Special Agent, I received approximately 25 weeks of training in the investigation of criminal violations of the Internal Revenue Code, currency transaction offenses in violation of the Bank Secrecy Act, and the laundering of monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957. This training has specifically covered the means and techniques, by which individuals engaged in criminal activities derive, launder, conceal and spend their illegal profits, and their use of assets to facilitate their unlawful activity. My training has also included means and techniques used by individuals to evade reporting and paying income tax, including the use of

25

nominees and misclassification of personal expenses as business expenses.

b.    I have been a Certified Public Accountant since January 2006 and became a Certified Fraud Examiner in November 2008.

c.    I have a Bachelor of Science in Business Administration with a concentration in Accounting from the University at Buffalo in Buffalo, New York and a Master of Science in Accounting and Information Technology from the University of Maryland University College in Adelphi, Maryland.

d.    I have been the affiant in over 40 authorized federal search and seizure warrants in several Federal judicial districts.

51.    I, Robert A. Richards, Jr., am a duly appointed Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been employed as such since October 12, 1999. I am currently assigned to the FBI's Charlotte Division, Raleigh Resident Agency, Raleigh, North Carolina (NC), to investigate violations of federal law. I am assigned to the FBI's Raleigh-Durham Safe Streets Task Force (RDSSTF) to investigate violations involving organized crime, money laundering, illegal narcotics, criminal street gangs, criminal enterprises, violent crimes, and firearm violations.

a.    I have received training in basic and advanced

investigative methods concerning organized crime, money laundering, gang identification, violent crime, and narcotic investigations, including the use of confidential human sources and Title III intercepts. Since February 2000 to the present, I have conducted investigations that have resulted in the arrest and conviction of numerous individuals involved with illegal narcotics trafficking, firearms violations, violent crimes, and criminal street gangs. As a result of these arrests and convictions, I have participated in the seizure of narcotics, money, United States currency, and physical assets. I have myself conducted, as well as assisted other law enforcement officers with physical surveillance, search warrants, seizure warrants and arrests of persons involved in organized crime, violent crimes, illegal drug activity, criminal street gangs, and firearm violations.

b. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

52. Based on our training and experience, we know that individuals involved in tax fraud activities and other financial crimes often willfully and knowingly misclassify, mislabel, or omit financial transactions and accounts from required reporting. We know that in order for criminals to conceal and hide sources of

taxable income, the books and records of the business are sometimes falsified.

53.  We understand that individuals involved in financial crimes often deposit all or portions of criminal proceeds into personal or business bank accounts, or bank accounts in the names of accomplices (or nominees), and oftentimes use several accounts in various financial institutions, inside and outside the United States, thereby concealing the nature, source, and ownership of the proceeds making the proceeds more difficult to identify.  We also know that monetary instruments, such as money orders and cashier's checks, are utilized by individuals engaged in criminal financial schemes.

54.  Also, we know that individuals involved in financial crimes and other illegal activities often place income and assets in the name of nominees in hopes of shifting their responsibility for the payment of tax and concealing their ownership to protect the assets from seizure.  However, such individuals often still maintain the titles and deeds to said assets, rather than the nominee owner.

55.  We also understand that individuals involved in financial crimes and other illegal activities often seek to conceal or disguise the nature, location, source, ownership, or control of property through a number of means, including wire transfers of funds using financial service companies, such as traditional

banks, money transfer companies (e.g., Western Union Company, MoneyGram International Inc.), and virtual currency exchanges, as well as trade-based money laundering that often involve the trading of commodity and products.

56. We also understand that the true nature, source, and ownership of assets may be determined by analyzing business and personal financial records created and maintained by legal and illegal business entities.

57. We know that individuals involved in criminal endeavors conduct financial transactions in a manner to avoid law enforcement detection. Based upon our training and experience, and consultation with other law enforcement, we know that persons involved in tax and other financial crimes oftentimes exchange currency for various types of monetary instruments, including postal money orders and bank cashiers' checks, and thereby attempt to disguise and conceal their true business and personal affairs.

58. Based on our training and experience, we know that individuals will deposit all or portions of corporate proceeds into personal bank accounts, or bank accounts in the names of accomplices (or, nominees), thereby we also know that monetary instruments, such as money orders and cashier's checks, utilized by individuals engaged in schemes to evade taxes, are often secured in safe-deposit and lock boxes.

59. SA Phillips is experienced in analyzing business and personal financial records created and maintained by legal and illegal business entities. Such analysis determines the validity of the books and records and provides leads to unreported income and non-deductible expenditures.

60. In the course of this investigation, SA Eric Phillips has reviewed and analyzed records from the IRS tax return database known as the Integrated Data Retrieval System ("IDRS"). We have both reviewed records from numerous federal, state, local, and foreign government agencies, including the financial records obtained by grand jury subpoenas, such as bank records, public records, and witness statements. We have also conducted witness interviews. The following information is based upon those sources as well as discussions with other investigators.

61. The facts in this affidavit come from our personal observations, our training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. Because this affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of a seizure warrant, it does not include all of the facts that have been learned during the course of this investigation.



## FACTS ESTABLISHING PROBABLE CAUSE

<u>Scheme to Extort Bribes/Kickbacks</u>

62. A reliable, confidential source, known to investigators ("CS-1"), having had a professional relationship with TEYF, dating back to when he/she and TEYF were both residents of Russia, has stated the following:

    a. In addition to providing security to TEYF while in Russia, CS-1 also acted as a go-between for TEYF and business associates.

    b. Anatoliy Serdyukov ("Serdyukov") served as the Russian Minister of Defense from approximately February 2007 through November, 2012. During this period, the company Voentorg became the primary contractor and private supplier to the Russian military. TEYF, Deputy Director of Voentorg, awarded contracts to subcontractors that actually fulfill the government contracts.

    c. CS-1 has overheard conversations between TEYF and subcontractors wherein it was discussed that a "kickback" as a "percentage" of the contract would be paid by the subcontractor to TEYF. There was not a single percentage that was consistent across all subcontractors; instead, TEYF demanded a specific "kickback" for each industry. The example given by CS-1 was that subcontractors providing uniforms would be required to kickback one amount while a different

amount would be demanded from those providing food services. According to CS-1, TEYF determined the percentage amount so that the contracted services could be provided without an "obvious decrease" in quality or quantity.

d. CS-1 was also present for multiple conversations between TEYF and Andrei Shokin ("Shokin"), the individual TEYF hired to manage TEYF's companies. The focus of these conversations was TEYF providing instruction to Shokin about how to transfer the proceeds of the kickbacks. TEYF also hired Yelena Zelenova (a/k/a Elena "Zelenova"), an accountant that maintained records of TEYF's companies, including the kickbacks he extorted from subcontractors.

e. While the bribe/kickback scheme was being perpetrated, TEYF instructed CS-1 to meet couriers at various locations around Russia and pickup large sums of cash. The only information TEYF provided to CS-1 was a telephone number and location to make the pickup. The locations were random and included airports, highways, and various other places. CS-1 opened the packages to ensure it was money but never counted it due to the volume. After the pickup, TEYF would call CS-1 and tell him which accountant to take the cash; CS-1 took the cash to whichever accountant he was instructed. The accountants were coordinated by Zelenova but didn't work directly for her.

f.     Most of the kickbacks were paid by TEYF to Defense Minister Serdyukov, with TEYF retaining the next largest share, and the remaining amount to be paid to other co-conspirators. CS-1 made three (3) deliveries of large amounts of cash to Defense Minister Serdyukov through Serdyukov's son-in-law "Puzikov". The money CS-1 delivered to Puzikov was always bundled and placed in large bags. CS-1 always had two (2) security cars escort him/her through Russia to Puzikov. CS-1 estimated the cash delivered to Puzikov to be in the amounts of $70 Million (USD), $30 Million (USD), and $50 Million (USD) for a total of $150 Million (USD).

g.     Sometime in or about 2013, TEYF's and Serdyukov's scheme became public and an investigation was initiated by Chief Prosecutor Fredinsky ("Fredinsky"). At TEYF's direction, $400,000 was delivered to Peredriy ("Peredriy"), an associate of Fredinsky's, in order to end the investigation. As a result of the bribe the investigation was ended and TEYF instructed CS-1 to approach Peredriy, and demand him to return the $400,000. In the conversation wherein CS-1 demanded the return of the $400,000 from Peredriy, Peredriy refused to return the money. CS-1 recorded the second conversation between CS-1 and Peredriy and has provided a copy to investigators.

h.     CS-1 would take money for TEYF or sometimes provide

escorts for others taking money on behalf of TEYF to Alfa Bank in Russia. TEYF is "computer illiterate" and would regularly have CS-1 handle TEYF's emails. CS-1 has seen documents showing TEYF had at least some of the bribe proceeds transferred to banks in Cyprus. TEYF has stayed in Cyprus for extended periods, up to six months on occasion.

i.    CS-1 knows TEYF to be a cunning man and would oftentimes use a cellular phone for only one (1) day.

j.    TEYF has occasionally hired CS-1 to help out at CTK Transportation, Inc. Whenever TEYF pays CS-1 for his/her work he calls it "financial assistance" and always pays him/her by MoneyGram from a bank in Russia. TEYF still owes CS-1 approximately $12,000.

k.    TEYF asked CS-1 to help him solve some issues at CTK. When CS-1 asked Timofeev to review the financial records, Timofeev refused him/her access. Timofeev and Timofeeva are the only individuals allowed access to the laptop with the CTK Transportation, Inc. financial records.

l.    CTK Transportation, Inc. was losing so much money that TEYF hired CS-1 as security to determine where the money was going. CS-1's conclusion is that TEYF operates CTK Transportation despite losing money because it only exists for TEYF to use to launder money.

m.    TEYF also owns a financial interest in some

trucking companies in the Salt Lake City, Utah area. TEYF is not involved in the management of those companies. TEYF has received trucks from the Utah based trucking companies in the past.

63. On or about April 9, 2009, Cotter filed Articles of Incorporation in the name of Delta Plus, LLC with the North Carolina Secretary of State's Office. The original address on file with the State of North Carolina was 1526 Town Home Drive, Apex, Wake County, North Carolina 27502.

64. On or about April 24, 2009, the Operating Agreement of Delta Plus, LLC made by and between FG Delta Plus, Cotter, L. Cotter and Delta Plus, LLC, was signed by Cotter, L. Cotter, and TEYF, on behalf of Delta Plus, LLC and by TEYF on behalf of FG Delta Plus. The Corporate Structure of FG Delta Plus, provided as an attachment to the Delta Plus, LLC Operating Agreement, included E.U. Zelenova as Vice-President of Finance and Vice President-Operations as E.F. Tsodikov.

65. On or about December 28, 2010, T. Teyf provided statements to officials of the United States government via Form I-485, Application to Register Permanent Residence or Adjust Status. According to Form I-485, T. Teyf claimed her current occupation was homemaker.

66. On or about December 28, 2010, Cotter provided statements to officials of the United States government via Form

I-140, Immigrant Petition for Alien Worker, as the representative of Delta Plus, LLC, on behalf of TEYF. The following is a summary of information provided with Form I-485:

      a.    TEYF was seeking status as an Alien Worker in the United States to permanently assume the position of President at Delta Plus, LLC with an annual income of $110,000.

      b.    Prior to serving as President of Delta Plus, LLC, TEYF served as the President of FG Delta Plus since 2005. FG Delta Plus was 80% owner of Delta Plus, LLC.

      c.    Beginning in April 2009, despite being organized to operate an urgent care facility in the Raleigh, North Carolina area, Delta Plus, LLC, purportedly began operations related to the worldwide distribution of the products produced by FG Delta Plus.

67. The Business Plan for Delta Plus, LLC, provided with Form I-140 for the years 2010, 2011, and 2012 stated the following:

      a.    As of the date of the Business Plan, FG Delta Plus had provided 80% of $600,000 that had been invested in Delta Plus, LLC, to date. The remaining amount of the financing came from Cotter and L. Cotter, collectively 20% owners of Delta Plus, LLC.

      b.    It was not anticipated that additional funds would be required before commencement of the operations of the urgent care clinic in May 2010.

68.　Supplemental information regarding TEYF's Form I-140, submitted on TEYF's behalf on or July 27, 2011, included the following:

　　a.　FG Delta Plus was owned by the following four (4) individuals:

　　　　i.　Andrey Kobzar of Moscow, Russia;

　　　　ii.　Renat Bajmeev of Moscow, Russia;

　　　　iii.　Sergey Visokiy of Moscow, Russia; and

　　　　iv.　Andrey Turchenkov of Astrakhan, Russia.

　　b.　TEYF received a portion of his salary from Delta Plus, LLC with a portion in the amount of RUB 1,833,000[1] annually coming from FG Delta Plus.

69.　In an interview with investigators on April 24, 2018, Timofeev stated the following:

　　a.　Timofeev is in charge of the finances at the CTK Transportation. Timofeev puts the financial transactions on paper in a excel spreadsheet and then prints these to a PDF file and sends them to TEYF so that he can review them on almost a daily basis.

　　b.　Timofeeva is in charge of the bookkeeping at Carolina Transportation and CTK Transportation, Inc.

---

[1] According to x-rates.com, as of July 27, 2011, the exchange rate of RUB to US Dollar was .036:1. The calculated amount FG Delta Plus provided to TEYF as a portion of his annual salary was approximately, $66,000.

c.      TIMOFEEV stated that he talks with TEYF around 8:00 PM - 9:00 PM almost every night to review the expenses and capital coming into CTK Transportation.

d.      Timofeev has had signature authority on the CTK Transportation bank accounts since beginning his employment in April or May 2015. Timofeev's salary is $1,600 per week in tax free income for his role at CTK Transportation. Timofeeva earns $1,100 per week for the bookkeeping at CTK Transportation.

e.      TEYF has had Timofeev register trucks in his name as well as the names of companies Timofeev has organized at the instruction of TEYF for the purpose of ownership of the trucks.

f.      Cotter is the manager of CTK Transportation and currently travels between his residence in Raleigh, North Carolina and Chicago, Illinois to perform his duties. Cotter is paid $1,700 per week in salary from CTK Transportation.

g.      TEYF started CTK Transportation with $1.8 Million and has only received $200,000 in return. From approximately the middle of 2017 through April 2018, Teyf had not made any additional investments in CTK Transportation.

h.      Timofeev is aware of international wires funding CTK Transportation.

## Analysis of Bank Records

70. Investigators have obtained intelligence that confirms TEYF has maintained bank accounts at Hellenic Bank in Cyprus.

71. Between January 18, 2011 and October 2, 2013, TEYF and T. TEYF received approximately 294 wires into four (4) bank accounts (BOA 3905, BOA 6014, BOA 3844, and BOA 9409) held at Bank of America, N.A. Of the aforementioned wires, 293 were received from banks outside the United States. All of the aforementioned wires were received from bank accounts held in the name of foreign corporations. The following tables summarize the foreign source, foreign bank account and countries where each was located.

a. Summary of Foreign Countries (Location of Companies)

| | BOA 3905 | BOA 6014 | BOA 3844 | BOA 9409 |
|---|---|---|---|---|
| Belize | $ 139,000 | | | |
| British Virgin Islands | $13,172,207 | $15,473,307 | $2,593,093 | $4,036,952 |
| Hong Kong | $ 891,700 | $ 2,077,600 | | |
| Panama | $ 158,000 | | | |
| Marshall Islands | | $ 374,000 | $ 179,000 | |
| Russian Federation | | | $ 4,949 | |
| Seychelles | $ 315,200 | | | |
| Total | $14,676,107 | $17,924,909 | $2,777,042 | $4,036,952 |

b. Summary of Foreign Companies

| | BOA 3905 | BOA 6014 | BOA 3844 | BOA 9409 |
|---|---|---|---|---|
| A.S.FAIRTIME LIMITED | $ 496,900 | $3,091,650 | $ 536,000 | |
| BEKTOP A.B.LTD. | $ 891,800 | $1,490,200 | $ 355,700 | |
| BURGOW OVERSEAS LTD. | $ 6,471,894 | $3,520,856 | | |

| | | | | |
|---|---|---|---|---|
| EPONLO INVESTMENTS LTD | | $1,048,170 | | |
| FOXCORP LIMITED | $ 58,700 | | | |
| GOLSTON HOLDINGS LTD | | $1,329,270 | $ 331,100 | |
| GREATEWOOD UNIVERSAL CORP. | | | | $4,036,952 |
| MORITAL HOLDINGS LIMITED | $ 2,814,492 | | | |
| MULLIGAN OVERSEAS LTD | $ 930,321 | $ 702,860 | | |
| NEARSTAR BB LIMITED | $ 957,100 | $1,326,940 | $ 338,100 | |
| PREBLE GROUP LTD | | $1,905,411 | $ 487,693 | |
| VERISON TRADING LTD | $ 551,000 | $1,057,952 | $ 544,500 | |
| KEYWELL TECHNOLOGY LIMITED | $ 452,900 | $ 126,000 | | |
| RINGO TRADING LIMITED | | $1,951,600 | | |
| SUNG HING LIMITED | $ 438,800 | | | |
| OKTAVA BUSINESS TEAM CORP | $ 155,080 | | | |
| PRANA INVESTMENTS MANAGEMENT INC. | $ 2,920 | | | |
| ALUNG ENTERPRISES LIMITED | | $ 374,000 | $ 179,000 | |
| TEYF LEONID MR. | | | $ 4,949 | |
| OVERSEAS PRODUCTION LTD. | $ 315,200 | | | |
| Redan Export, LTD | $ 139,000 | | | |
| **Total** | **$14,676,107** | **$17,924,909** | **$2,777,042** | **$4,036,952** |

    c.   Summary of Foreign Country (Financial Institution)

| | BOA 3905 | BOA 6014 | BOA 3844 | BOA 9409 |
|---|---|---|---|---|
| United States of America | | $ 149,101 | | |
| Cyprus | $13,784,407 | $15,698,207 | $2,777,042 | $4,007,452 |
| Hong Kong | $ 891,700 | $ 2,077,601 | | |
| Russian Federation | | | | $ 29,500 |

| | | | | |
|---|---|---|---|---|
| Total | $14,676,107 | $17,924,909 | $2,777,042 | $4,036,952 |

### d. Summary of Foreign Financial Institutions

| | BOA 3905 | BOA 6014 | BOA 3844 | BOA 9409 |
|---|---|---|---|---|
| JPMORGAN CHASE BANK, NA | | $ 149,100 | | |
| EUROBANK EFG CYPRUS LTD | $ 3,111,492 | | | |
| HELLENIC BANK PUBLIC COMPANY LTD | $10,299,015 | $15,324,207 | $2,598,042 | $4,007,452 |
| MARFIN POPULAR BANK PCL | $ 373,900 | $ 374,001 | $ 179,000 | |
| DBS BANK (HONG KONG) LIMITED | $ 438,800 | | | |
| STANDARD CHARTERED BANK | $ 452,900 | $ 2,077,601 | | |
| GLOBEX COMMERCIAL BANK JOINT STOCK | | | | $29,500 |
| Total | $14,676,107 | $17,924,909 | $2,777,042 | $4,036,952 |

72.  Each of the wires received by TEYF, T. Teyf, and Cotter included instructions from the originator of the wire to the beneficiary of the wire. The following is a summary of the instructions by description for each account:

| | BOA 3905 | BOA 6014 | BOA 3844 | BOA 9409 |
|---|---|---|---|---|
| Payment for Buying Business per Agreement[2] | $9,286,386 | | | |

---

[2] According to the Business Plan for Delta Plus, LLC, FG Delta Plus was to provide 80% of the $600,000 ($480,000) to be in Delta Plus, LLC, to date; and the remaining amount of the initial investment was to come from Cotter and L. Cotter.

| | | | | |
|---|---|---|---|---|
| Payment for Goods/Services per Invoice[3,4] | $5,389,721 | | $2,772,093 | |
| Payment/Return on Loan Agreement | | $17,924,909 | | |
| Transfer of Own Funds[5] | | | $ 4,949 | $4,036,952 |
| Total | $14,676,107 | $17,924,909 | $2,777,042 | $4,036,952 |

73. Based on the training and experience of Special Agent Phillips, the use of shell companies incorporated in "jurisdictions of primary concern" such as such as Belize, British Virgin Islands, Hong Kong, and Panama, and "jurisdictions of concern"[6] Marshall Islands, and Seychelles; the use of intermediary banks in places like Cyprus and Hong Kong; and the use of bogus wiring instructions, when considered in their entirety, are consistent with international money laundering.

74. Since January 19, 2011, TEYF, T. Teyf, Timofeev, and others have made in excess of 575 transfers between the accounts which were used to receive the international wires (BOA 3905, BOA 6014, BOA 3844, and BOA 9409) and other accounts held at Bank of America, N.A., PNC Bank, N.A., BB&T, and First Citizens Bank, among

---

[3] During the years the foreign wires were received, 2011 - 2013, TEYF and T. Teyf reported approximately $211,557 of taxable income, none of which appeared to be from foreign sources.

[4] During 2011 - 2013, CTK Transportation, Inc. reported total gross receipts of $432,548.

[5] Neither TEYF nor T. Teyf reported ownership, control, or authority of any foreign financial accounts on Forms 1040, Schedule B, during the years 2011 - 2013.

[6] "Jurisdictions of Primary Concern" and "Jurisdictions of Concern" in reference to "major money laundering countries", according to the U.S. Department of State website

42

other institutions, under the control of TEYF, T. Teyf, Timofeev, and others. The table below shows the aggregate deposits of criminal proceeds of TEYF's specified unlawful activities:

| Account | Amount |
|---------|--------|
| BOA 3905 | $ 14,676,108 |
| BOA 6014 | $ 17,924,907 |
| BOA 3844 | $ 2,777,022 |
| BOA 9409 | $ 4,036,952 |
| BOA 1991 | $ 14,939,556 |
| BOA 9748 | $ 9,000,000 |
| BOA 3285 | $ 5,962,121 |
| BOA 1736 | $ 1,300,000 |
| BOA 1314 | $ 30,000 |
| BOA 1292 | $ 56,000 |
| BOA 3691 | $ 60,000 |
| BOA 1563 | $ 40,000 |
| BOA 7892 | $ 25,000 |
| BOA 4884 | $ 267,500 |
| FCB 3951 | $ 2,450,000 |
| BBT 1502 | $ 5,035,000 |
| FCB 3812 | $ 5,035,007 |
| FCB 0897 | $ 5,000,000 |
| PNC 4726 | $ 5,035,000 |
| PNC 4742 | $ 5,035,000 |

75. TEYF, T. Teyf, Cotter, Timofeev, and Timofeeva executed the following transactions of funds traceable to the criminal proceeds of TEYF's specified unlawful activity, each in excess of $10,000:

| Account # | Type | Date | Description | Amount |
|-----------|------|------|-------------|--------|
| BOA 6014 | DEBIT | 05/29/2014 | Transfer to BOA 1991 | $ 9,000,000 |
| BOA 9409 | DEBIT | 09/02/2014 | Transfer to BOA Checking 0990 | $ 50,000 |
| BOA 9409 | DEBIT | 09/25/2014 | Wire to PNC Checking 5564 | $ 30,000 |
| BOA 9409 | DEBIT | 11/04/2014 | Wire to PNC 5564 | $ 19,000 |
| BOA 3844 | DEBIT | 01/20/2015 | Transfer to BOA 6014 | $ 200,000 |

43

| BOA 1991 | DEBIT | 01/26/2015 | BOA 6014 | $ | 2,000,000 |
| BOA 6014 | DEBIT | 02/12/2015 | Wire to BOA 1736 | $ | 450,000 |
| BOA 9409 | DEBIT | 02/19/2015 | Wire to Wells Fargo Checking 1952 | $ | 132,000 |
| BOA 6014 | DEBIT | 11/06/2015 | Transfer BOA 1736 | $ | 700,000 |
| BOA 6014 | DEBIT | 02/03/2016 | Transfer to BOA 1736 | $ | 100,000 |
| BOA 6014 | DEBIT | 06/14/2016 | Transfer to BOA 3844 | $ | 300,000 |
| BOA 6014 | DEBIT | 06/22/2016 | Transfer to BOA 9748 | $ | 9,000,000 |
| BOA 6014 | DEBIT | 08/30/2016 | Transfer to BOA 1563 | $ | 40,000 |
| BOA 3285 | DEBIT | 10/12/2016 | Payment of Real Estate Taxes 6510 New Market Way, LLC | $ | 50,662 |
| BOA 1736 | CHECK | 11/29/2016 | CHECK #1074 Payable to John Cotter "INVEST RETURN" | $ | 50,000 |
| BOA 1736 | CHECK | 11/29/2016 | Check #1075 Payable to John Cotter "PROFIT" | $ | 21,857 |
| BOA 1736 | DEBIT | 08/11/2017 | Transfer to BOA 4884 | $ | 260,000 |
| BOA 6014 | DEBIT | 11/02/2017 | Transfer to BOA 7892 | $ | 25,000 |
| BOA 1991 | DEBIT | 02/14/2018 | Wire to FCB 3812 | $ | 5,035,007 |
| BOA 1991 | DEBIT | 02/14/2018 | Wire to BB&T 1502 | $ | 5,035,000 |
| BOA 1991 | DEBIT | 02/14/2018 | Wire to PNC 4726 | $ | 5,035,000 |
| BOA 9748 | DEBIT | 04/02/2018 | Wire to FCB 3951 | $ | 50,000 |
| BOA 9748 | DEBIT | 04/04/2018 | Wire to FCB 3951 | $ | 1,000,000 |
| BOA 3905 | DEBIT | 04/23/2018 | Official Check | $ | 1,087,804 |
| BOA 3905 | DEBIT | 05/10/2018 | Transfer to BOA 1314 | $ | 30,000 |

## Analysis of Other Financial Records

76. Despite admitting to an annual salary of approximately $83,200 (Timofeev) and $57,200 (Timofeeva), neither Timofeev nor Timofeeva have filed an Individual Income Tax Return for income earned in the U.S. for the years 2015, 2016, or 2017.

77. For the calendar years 2011 through 2014, TEYF and T. Teyf filed annual U.S. Individual Income Tax Returns (Forms 1040/1040A) with the Married Filing Joint status[7]. The following is a summary of the information from TEYF's and T. Teyf's Forms

---

[7] Pursuant to 26 C.F.R. §1.1-1(b) (Citizens or Residents of the United States Liable to Tax), all citizens of the United States, wherever resident, and all resident alien individuals are liable to the income taxes imposed by the Internal Revenue Code whether the income is received from sources within or without the United States.

1040/1040A:

a.    Summary of Income, Deductions, Credits, and Tax

|  | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|
| Wages | $41,667 | $48,623 | $25,200 | $    9,016 |
| Interest | $11,488 | $50,483 | $34,096 | $   30,838 |
| Gains/Losses |  |  |  | ($   3,138) |
| Schedule E |  |  |  | ($160,285) |
| Total Income | $53,155 | $99,106 | $59,296 | ($123,569) |
| Taxable Income | $23,055 | $68,206 | $27,596 | ($213,657) |
| Due/(Refund) | ($4,892) | $    252 | ($1,608) | ($    982) |

b.    Summary of Affirmative Answers on Schedule B Part

III (Foreign Accounts and Trusts)[8]:

|  | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|
| 7a[9] | No | No | No | No Answer Provided |
| 8[10] | No | No | No | No Answer Provided |
| Gains/Losses |  |  |  |  |

---

[8] On Schedule B, Part III of Forms 1040/1040A, U.S. taxpayers are required to affirmatively answer whether or not they "had a financial interest in or signature authority over a financial account located in a foreign country." The answers to questions in Form 1040/1040A, Schedule B, Part III are made "under penalties of perjury," with the declaration that the taxpayer has "examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true…"

[9] At any time during the year, did you have a financial interest in or signature authority over a financial account (such as a bank account, securities account, or brokerage account) located in a foreign country? See instructions

[10] During the tax year, did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust?



46

78. For the calendar years 2012 through 2016, Forms 1120S (U.S. Income Tax Return for an S Corporation) were filed in the name of CTK Transportation Inc. The following is a summary of the information from the CTK Transportation Inc. Forms 1120S:

| | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Gross Receipts | $ 0 | $432,548 | $794,415 | $4,817,666 | $3,149,945 |
| Cost of Goods Sold | $ 0 | $ 0 | $ 0 | ($899,176) | ($669,779) |
| Net Receipts | $ 0 | $432,548 | $794,415 | $3,918,490 | $2,480,163 |
| Less: Total Deductions | $ 0 | ($411,464) | ($822,352) | ($4,091,530) | ($2,713,590) |
| Ordinary Income/(Loss) | $ 0 | $ 21,084 | ($ 27,937) | ($ 173,040) | ($ 233,427) |

## SUMMARY OF PROBABLE CAUSE

79. For purposes of this seizure warrant, we have probable cause to believe the aforementioned assets are subject to seizure pursuant to 18 U.S.C. §§ 981, 982, and forfeiture as property involved in money laundering transactions pursuant to 1956(a)(1), 1956(a)(2), 1957, and 1956(h) based on the following:

a. Prior to becoming a resident of the United States, TEYF conspired with senior Russian government officials to extort bribe/kickbacks from subcontractors of large Russian military contracts. TEYF employed others to facilitate the

46

transfer of his portion of the proceeds from the criminal scheme to financial institutions in foreign countries, largely consisting of the high-risk jurisdictions of Cyprus and Hong Kong.

b.   After arriving in the United States TEYF received 294 wires from foreign sources worth over $39,500,000, into bank accounts in the name of TEYF, Cotter, and T. Teyf, who stated to U.S. Officials that she was a homemaker. TEYF and co-conspirators attempted to conceal the source of the foreign wire by using shell corporations organized in countries known to harbor money laundering operations. Additionally, the wires received by TEYF included descriptions such as "Payment for Buying Business," for approximately $9,285,000 despite declarations made to U.S. Officials that the owners of FG Delta Plus did not include TEYF; "Payment for Services"/"Payment for Goods" for approximately $8,160,000, despite TEYF reporting a collective net loss in the years 2011 – 2014 on his U.S. Individual Income Tax Returns; and "Transfer for Own Funds" for approximately $4,040,000, despite declaring that neither TEYF or T. Teyf had a financial interest in or signature authority over a financial account located in a foreign country.

c.   From 2011 – 2013, TEYF and others conspired to use financial institutions of the United States to launder over

$39,415,000 of criminal proceeds from schemes TEYF organized prior to his residency in the United States.

80.     The funds contained in BOA 3905, BOA 6014, BOA 3844, BOA 9409, BOA 1991, BOA 9748, BOA 3285, BOA 1736, BOA 1314, BOA 1292, BOA 3691, BOA 1563, BOA 7892, BOA 4884, FCB 3951, FCB 0918, BBT 1502, FCB 3812, FCB 0897, BBT 4304, and PNC 4726 represent the proceeds of specified unlawful activity due to TEYF's use of the aforementioned accounts, nominees, and co-conspirators to launder the proceeds of a criminal bribery/kickback scheme.

81.     The defendant funds and proceeds traceable thereto are identical to property involved in, or traceable to, transactions or attempted transactions in violation of 18 U.S.C. § 1956 and 1957. Therefore the aforementioned assets are liable to condemnation and forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1).

82.     Because the property sought to be seized can be easily moved or transferred, out of the reach of the United States a restraining order under Title 21, United States Code, Section 853(e) would not be sufficient to assure the availability of the property for forfeiture."

Further the affiants saith naught.

_Eric J. Phillips_
ERIC J. PHILLIPS
SPECIAL AGENT
INTERNAL REVENUE SERVICE

_Robt A. Richards_
ROBERT A. RICHARDS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

On this __5__ day of December 2018, _ROBERT A. RICHARDS, JR. + ERIC J. PHILLIPS_ appeared before me via reliable electronic means, ~~was~~ placed under oath, and attested to the contents of this Affidavit.

_James E. Gates_
JAMES E. GATES
UNITED STATES MAGISTRATE JUDGE

49

## ATTACHMENT A

1.    The balance of funds in account number 5384574726, (hereinafter "PNC 4726") in the names of Leonid I. Teyf and Grigory L. Teyf at PNC Bank in an amount not to exceed $5,035,000, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account;

2.    The balance of funds in account number 5384574742, (hereinafter "PNC 4742") in the names of Leonid I. Teyf and Grigory L. Teyf at PNC Bank in an amount not to exceed $5,035,000, the proceeds of LEONID I. TEYF's specified unlawful activities that have been deposited into the account.